Mr. Longmore. Thank you, and may it please the court. I'm Chris Longmore. I'm here on behalf of the appellant in this case, Christy Boyle, who's here in the courtroom with us today. In the case that we're here to discuss today, Senator, it's around the tragic events that occurred on April 13, 2021, when the appellee, a Maryland State Trooper, Azzari, shot and killed 16-year-old Peyton Hamm. Your Honor, to frame the argument that we're going to make today, we think there's one critical question that this court should focus on, and likewise that the district court answered incorrectly. And that question is, could a reasonable jury in this case find excessive force because it was not clear that Peyton Hamm continued to pose an immediate threat of physical harm to Trooper Azzari at the time the trooper fired the final four shots that killed Peyton Hamm? Counsel, I'm sorry, can I, I just want to make sure I understand this. So your position is that if it is not clear that he was not a threat, no, if it was not clear that he was a threat, then the force was excessive. It has to be clear that there is a threat before an officer can use force. Your Honor, our position, this comes from the Esteta Jones case that's cited in our case, and I didn't quote it verbatim, I changed the names for the case that's here. It's whether or not, whether a reasonable jury can find that it was not clear that Peyton continued to pose some harm to this officer. So my concern is that I think we have cases saying, you know, if it's clear that the victim is incapacitated or would be clear to a reasonable officer, then the use of force is excessive, but that in the kind of fuzzy area where it's just sort of not clear whether there's an ongoing threat, we actually allow officers to sort of err on the side of protecting themselves. Certainly, Judge Harris, there is case law that allows officers to use reasonable care. A lot of these decisions are made certainly in heated moments like they were done here. However, we believe that that is more of a factual decision in this case based on the facts that were pled in our summary judgment motion as to whether or not Peyton really posed a threat to officers or troopers, sorry, at the time that the second round of shots that were fired. We had cited in the brief, and there are facts, you know, one, the posture of this case was a motion dismissed, so there's been no discovery. My client has not been afforded any of that opportunity. So the facts that are in the case are based on the investigation we were able to do pre-suit and as a result of the motion. There are facts in the record, one being the statement of an eyewitness that saw the second round of shots, also took a photograph that's in the record that showed that that, and there was a quote by that witness in her statement that said that Mr. Hamm appeared dazed. He was on his knees. There is no allegation by Trooper Azari that there was any firearm. But I, the neighbor also says, right, that he's trying, he's pulled a knife, that she's yelling at him to drop the knife, but he doesn't, and then he's trying to stand up. There was a statement in there that it appeared that he was trying to stand up, and that was in her statement that is in the record. I don't believe she said he pulled a knife. She did say that she was yelling at him to drop it because she heard another person across the scene saying the same thing, and heard Trooper Azari say the same statements to him. The fact that people were yelling that, though, Your Honor, came up in the case of a state of Jones as well. There are facts very similar in that case that I'll get to in a minute, where there were complaints that somebody had a knife, that they were told to drop the knife, and that was not enough in that case to support the troopers or the officer's conduct in that case. Mr. Longmore, can you help me? How is it that the court, you didn't get discovery? I mean, I don't understand that. It was filed as a motion to dismiss, a 12B6 motion that the court treated as a motion for summary judgment, so there has been no answer filed in this case at this point. That seems to be error there. I mean, we're on summary judgment here now, and you seem to be entitled to some discovery, because one of the questions Judge Harris very astutely asked, the question is the clarity of whether or not the danger was such that a reasonable jury could find that no reasonable officer would have felt that he was still in danger. One part of it is that the autopsy report, what was his condition after the first round of 11 shots? That would be very relevant as to what might be his condition, and you couldn't get discovery on an autopsy? We certainly believe that, Your Honor, that that's very important. There is, in the joint appendix, there are the copies of the requests that my client had made to the medical examiner office in Baltimore repeatedly to get copies of the autopsy report. She was not able to get that. To my knowledge, we have not been able to receive it even to this day, despite repeated multiple requests. If we were able to use the tools of discovery, including the subpoena power, I believe we would be able to get a copy of that. However, the district court ruled on this before any discovery was allowed, so we have not been provided the opportunity to employ the rules of civil discovery that otherwise we would have been able to receive. We did receive some information on our own investigation from the Maryland State Police through a Freedom of Information Act request. That's cited in our briefs as well. There was information that we asked for that we did not obtain, such as the training of the officer, which can be very critical in these cases, as well as the personnel file to see if there's anything in there that may be relevant. We have not been provided that information either. That is one of our arguments, that the court, at the very least, was very premature in its decision not to allow us the opportunity to perform discovery in this case. So we think that that reason alone would be appropriate for a remand to allow us to go forward. Certainly the state and Trooper Azari would have the ability, if they chose to, to file another summary judgment once discovery was complete. We believe respectfully that my client deserves that right. I know the court has looked at the pleadings in this case and the facts that are there. What we think the real legal error was, aside from the fact that we were not provided discovery, was that the district court applied the wrong legal standard. We briefed that in our briefs. One of the critical mistakes we think that the court made was that it really did not discuss the two rounds of shots as two separate incidents. There's been a lot of case law in recent years from this circuit confirming that that is the standard to apply when an officer, when there are two incidences and an officer has time to determine whether or not the initial threat has dissipated. Yeah. I think the district court did apply that standard, but the district court thought that at the time of the second round of shots, and this is a very sad case, but that I think the district court thought at the time of the second round of shots, it wasn't clear to the officer that the threat had dissipated because the officer does say that he saw that the boy had been wounded in the shoulder, but that the boy was still on his knees, now had a knife in his hands, and was trying to get up. And that much seems to be sort of undisputed because the plaintiff's own witness is saying the same thing. And I think the district court, looking at that moment, thought it would not have been clear to a reasonable officer that the threat was over. So can you, I just want to give you a chance to address that. Certainly. Why would it have been clear, in your view, to this officer that at that point there was no longer a threat? Well, so to address that, and again it's what a reasonable jury will think, not what... Yes, what a reasonable jury would think a reasonable officer would have thought, yeah. So the facts that we think that should be relied upon were the distance that the beside him in that photograph. Trooper Azari, in his statements, had backed away from him. His estimate was 15 to 25 feet. That's what the district court judge considered. Payton was on his knees, wounded very seriously at the time. The witness that... But what matters, right, is how... I regret talking about the case this way, but what matters is how wounded the jury might think a reasonable officer should have known. And whether a reasonable jury could hear that a 16-year-old boy was on his knees, wounded, and officer was 15 to 25 feet away, that the 16-year-old was not standing or approaching the officer at this point, and that there was another police car right there, because we can see it in the photo that's in the record, whether that was reasonable force at that time for that officer to believe that his life was in danger. One of the factors that is not in this case, there is no danger to any other third parties. A lot of the cases cited in the briefs and even the court relied upon had that standard, and that's certainly part of the standard. Trooper Azari himself, in both his statements, said there was nobody else there. It was just him and Payton at that moment. The witnesses were in their house behind closed windows. There was no threat to them. And Trooper Azari, I don't think, even knew they were there the way that it sounded. The reason why I go back to why the district court did not apply the proper standard, because in addition to talking about the knife that Payton had on him at the time this happened, the district court also stated that it was immediately or quickly after the officer had seen him with what he thought was a gun. We know now it was a replica, a toy gun, but at the time the officer thought that was a gun. That's where the district court said that right after he thought he saw a gun in his hand, Payton was on his knees 15 to 25 feet away, and the officer included that in whether he thought it was reasonable. You don't think it's relevant? I mean, I think the point the district court was making is the officer had some reason to believe that this person wished him harm because a moment before he'd been pointing a gun at him. I don't think the — at least I did — tell me if I'm wrong. I did not read the district court to be saying, you know, like it's all — because you had a right to use force when you thought he was pointing a gun at you, you also therefore can do whatever you want for a certain period of time after that. I thought the district court was saying using the moment before pointing of what the officer thought was a gun to show that the harm. And, Your Honor, if that is how the district court intended it, if that was the intention behind it, we believe that would run afoul of the more recent case law that the district court did not rely upon, including the Estate of Jones case. In that case, there was a defendant with a knife on his person. Not only did they have a knife on their person, they had struggled with the officer and actually stabbed one of the officers. They stepped back a few feet and shot Mr. Jones to death. That was within seconds, if you read the court case. I'm familiar with the case. I wrote the opinion. Yeah. There were five officers on top of him, and they said he had a knife. And they backed up and shot him. That's correct, Your Honor. And that is what happened in that case. And in that case, one of the ways that we view that is that if that defendant had a knife, any of the officers could say, I was protecting my fellow officers and myself from that. In this case, this was not instantaneous. This was a minute after, 57 seconds. We know that from the door cam video that we obtained from the time that Trooper Azari fired his first 11 shots, investigated the situation, was able to get within feet of Payton, was able to back away without any danger to himself, 15 to 25 feet away from him, and then shoot him at that point because he said at that instant he thought he was in danger. We think that a reasonable jury could say that a reasonable officer would not think he was in danger at that point because he had investigated Payton. He had seen the injury that he had. He saw him on his knees, agreed that he had dropped to his knees. He had no fear of what he thought was a gun at that point. None of that is in Trooper Azari's statements. And once he backed away, once he got out of that zone of danger where there was some potential harm to him, that's when he shot the final four shots that sadly killed Payton at that point. And that's why we think that a jury could find that a reasonable officer would not have been in fear of his life being 15 to 25 feet away from an injured 16-year-old just because he's holding a knife. Doesn't there have to be, for want of a better word, a gap between the first encounter and the second encounter? And I don't think you have that here. You have just a continuing altercation, and you can't apply a retrospective analysis to a situation where a policeman is in an emotional situation. Respectfully, Your Honor, to address that. I know I'm eating into some of my time. The Waterman case has addressed that. We think there was sufficient time in between. The Waterman case said that force that is initially justified is not justified even seconds later if the justification has been eliminated. And we think that in that case, there is a defendant driving a vehicle at some officers. They shot at the vehicle as it was coming toward them. The vehicle went by them, and they continued to shoot at the vehicle in that same instant. And the Fourth Circuit in that case said that second round of shots, once the vehicle had gone past you, was not justified. In this case, there was even longer. The officer had had the opportunity to get within feet of Payton, see him kneeling there, see him injured, and back away with no threat, no lunges at him, no threats to the officer by Payton. The only thing the officer said Payton said to him was that Payton wanted to die. But he had a knife and what the officer might have thought was a gun. If he had a knife, that is correct, Your Honor. There was no statement by Trooper Azari in either of his two statements that he feared for the gun when the last four were fired. Do we know where the gun is at this point? Or what everybody thought was a gun and turned out not to be? It was in evidence in this case. I don't remember if there's a photo in the briefs file. No, I just meant as this is unfolding. So do we know where at the time of the second round of shots, where the gun was? We do not know that. One of the reasons why is Trooper Azari did not say that in either his statements that we were not able to participate in. If I deposed Trooper Azari, that would certainly be a question I would ask him. That's why we, one of the reasons we believe discovery would be appropriate in this case. All right, so in this case you're left with his statement and you had no chance to have a discovery. That's correct, Your Honor. We've had no access to Trooper Azari to question him in any way. It was questioned as part of the Maryland State Police investigation six days after the incident. Do we even know how many, if any, of the first 11 shots hit him? We received some preliminary information about that, but I don't have the specific number to me. There were many. From whom? From what source? From some of the medical personnel that treated Peyton on the scene. That's not in the record, really, is it? No, it's not, Your Honor. That's what I'm saying. In the Fourth Circuit, we don't review summary that. We consider that almost jurisdictional. We don't do that. I'm just telling you, I can't understand how, because the thing is this, for example, we don't know. Let's say, I guess it would be hypothetical, let's say three shots, four of the first range of barrage of shots hit him. Then if you don't know how many hit him and where it hit him, an expert might be, I'm just saying this is all hypothetical, maybe say no. Based on a person being wounded, those first shots, which we determined based on angle, that he may have come up trying to get up, but people many times do when you, in other words, for example, sometimes, well, I'll get into it, but when you think you're dying, you try to do something to animate yourself to do that. Not knowing that is one thing. You come up like this with a knife, or did you come up like almost in a daze, bleeding, dying? That's important in this case, it seemed to me. We certainly agree, Your Honor. Another fact that we think will come out of a review of the autopsy is that Trooper Azari, in his affidavit with his motion to dismiss, said that Peyton got up and took steps toward him, that he was standing up and took a step toward Trooper Azari. The witness doesn't say that, so we think that's a disputed material fact, but if Peyton was standing at the angle of the shot. So the district court, I think, understood, as it had to, that that was a disputed fact, the steps forward, and the district court thought that's not material, so there's no need for discovery that will shed light on whether or not there were actual steps forward, because it's enough that he had the knife and your own evidence, the witness statement shows that he was trying to stand up. So the district court thought it just doesn't really matter whether he was trying to stand up or had already taken a step or two. I agree that's what the district thought, and we think that that was an error, because what the district court is saying, that any time an officer is 15 to 25 feet away from a victim that is kneeling, wounded, and has a knife, you're allowed to shoot him. Right. It's contrary to Jones. And we think it's contrary to Jones, to Harris v. Pittman, the standards that are set forth in there. It doesn't take into account the change in circumstances. In those 57 seconds, which we're lucky to have, because there happened to be a door camera on across the street to get that time period. Again, we might be able to develop that more in discovery if we had that. But we think that that, when you look at the district court's decision and what it relied on, it did say that it just doesn't matter if he was standing up and lunging at us. That's directly contrary to Sigman, as well, in Chapel Hill. In that case, a drunk, older adult that had threatened the police, had swung his knife out a window and broke a window, charged at the police, and that's one of the cases the court relied upon in saying this was reasonable because Payton also had a knife. Those facts are clearly distinguishable. Counselor, can I, I know you're over your time, but if I could ask one more question, it would be helpful for me in thinking about this case. So, I mean, would your argument be the same if there were facts in this minimal record? Say the neighbor had said he tried to stand up, he got to his feet, and he took a step toward the officer. Would your argument change, or would it still be like, whatever, he's a wounded boy with a knife, and he's still now, by hypothesis, 14 feet away from an officer with a gun. Like, he is not, you know, the officer can step back. I think, Your Honor, that a reasonable jury could look at the distance that he was away from him and what his physical condition appeared to the witnesses that were on the scene to see if a reasonable officer would think that that would be. So, even if he's moving toward the officer with a knife, like, the officer should just back up. He's got reinforcements. If he's 25 feet away and he takes one labored step because he's been shot, it may not be reasonable to shoot him in that instance. If he's running at him with a knife, it may. The problem with the hypothetical is that we believe that's up for the jury to decide. Well, I know. It is just a hypothetical. I'm just trying to figure out at what point you think, as a matter of law, an officer is entitled to defend himself. So, there could be a couple of steps before the officer is entitled to do anything. There could be, Your Honor. We think that that's the balance that the courts have struck, most particularly recently in the 2019-2020 cases that we cite, that have further developed what this constitutional standard is. The district court didn't get to the qualified immunity analysis, but the only two cases it cited were much older than the Harris v. Pittman and the State of Jones case. Well, Harris v. Pittman, I mean, that, which I wrote, the dispute was that the he was flat on the ground, had been shot, but was flat on the ground on his stomach and was shot in the back. I think that is somewhat different from someone who is on his own and unarmed. And that seems somewhat different from someone who is on his knees trying to stand up with a knife. I'm just not sure that those are exactly analogous. I think Harris v. Pittman and the State v. Jones together, I think, are how we look at it. And that one, certainly, there are facts that are not analogous in that. That did occur, as I know Your Honor is aware, after the defendant and the officer had been in, you know, I think the struggle, a hand-to-hand struggle, where the defendant attempted to shoot the police officer with the officer's weapon and attempted to tase the police officer with that. So there was clearly more evidence in that case that the defendant meant to harm the police officer. But it was obvious, as alleged, that he was now fully incapacitated. So that goes back to my original question. Is it that the use of force is unreasonable if a reasonable jury could not find that a reasonable, is it that the force is excessive if a reasonable officer would have to know that this person is now incapacitated? Or is force excessive if it's not clear whether or not the person is incapacitated? And I think you're saying the second. If it's not obvious that this person is incapacitated, it's not obvious that this person is not incapacitated, then the officer can't use. I'm sorry, I've lost the negatives, but you know what I mean. No, and I do. And one of the challenges that we have in this case, it goes back to us not being afforded discovery, is in Harris v. Pittman, the defendant could tell you what he thought. Payton cannot in this case. Well, but this is something that occurred, yes, and that we have said so many times, yes, that if, you know, when the victim dies, you only have the officer's account. And if all we had here was the officer's account, then I would think, well, we obviously need to get some more evidence, because for all I know, like the man in Harris, he's lying on his stomach, prone and unarmed when he shot. But your own evidence shows that that is not the case. You've got the neighbor saying, it's not that kind of a case. He's on his knees, he has a knife, he won't drop the knife, and he's trying to stand up. So we can already rule out sort of the Harris line of cases, right? And I guess it depends on whether there's degrees of incapacitation and who decides that, Your Honor, we think that a reasonable jury could look at this and say he was incapacitated enough that a reasonable officer would not find him a threat at that point. That's really the, you know, I think what it boils down to in our argument. Yeah, it's almost like saying without that, I mean, we don't know where he was shot, but it's like someone, he shot, what, around 11 times, and let's say one hit him in the forehead, he shot in the head. And then he, because of the evidence, he was on his knees, he was trying to get up, then that's automatically justified just because he was on his knees trying to get up. Without, a jury might say, wait a minute, yeah, he was on his knees, but he was shot in the head. We don't, I mean, I'm just saying, the only evidence we have from the witnesses was that there was a shot somewhere in his arm region and they could see blood. The witness, not the officer saw it as well, but the witness from her window could see blood dripping to the ground as he'd been shot. So it was clearly that it was not a nick. It was, he was laboring. He said he seemed dazed at the point. There is evidence in there from the witness statement. The witness said he seemed dazed, right? That he seemed dazed as he was kneeling on the ground after being shot a full minute before, you know, it wasn't a few seconds before, it was a full minute before when the officer had time to reload his weapon and walk around him and investigate it. We just, certainly we think this at least deserves discovery. We think Peyton's bomb has the right to conduct discovery in this case like other plaintiffs have been given. So thank you. I know I took over my time. We're asking you questions, that's fine. Mr. Pickens? Pickus? Pickus, I'm sorry. Mr. Pickens. You got it right, your honor. Thank you. May it please the court, my name is Phil Pickus. I am an assistant attorney general in the Maryland Attorney General's Office. I represent Maryland State Trooper Joseph Azari. Joining me at the trial table is my colleague, Amy Hott. May we have your counsel? There is no doubt that this was a tragic case, but it's key to remember that we must look at this case from the perspective of what Trooper Azari knew when he fired his weapon. This court and the Supreme Court has told us many times that we are not supposed to second-guess Trooper Azari in hindsight. We are supposed to solely look at what he knew when he pulled the trigger. And the reason for this... What a reasonable officer would have known... Yes, sir. ...when he pulled the trigger. Correct. And the reason for this is because this court, the Supreme Court, the law in general, has acknowledged police officers are often in very dangerous situations and have to make split-second decisions. That's understood. Okay. That's right. He arrives at a scene and sees a young man with what looks like a fully operable gun. That young man, Mr. Hamm, then points the gun at him. He instructs Mr. Hamm on several occasions to drop the gun, and Mr. Hamm does not do so. Fearing for his own life, he fires his weapon in self-defense. How many times? We do not know exactly how many times. How many times did it hit him? Do we know that in this record? We only know that... Do we know that in the record? We know one bullet hit him in the shoulder. That's the only thing we know, Your Honor. But you don't know whether that was the only one or not. Well, we know Trooper Azari did not see any other injuries. Well, because he said that? Yes, sir. We have to accept that? This is the problem. We have to accept that fact without discovery? Why do you think that's the law? I agree that the standard, we have to do that, but we have to accept that? Your Honor, I think your question suggests there's an automatic right for discovery. By the way, Mr. Longmore said this was a motion to dismiss. It was a motion for summary judgment, just to make the record clear. It never was a motion to dismiss? It was a motion to dismiss or an alternative motion for summary judgment. The district court treated it as a summary judgment. There is not an automatic right for discovery. First, a qualified immunity was raised in this case, and that is a defense to suit, not just the trial, but more importantly... I think we usually, I think we've said a couple of times, qualified immunity is usually decided after discovery. Like, it is a little bit unusual to resolve that before discovery, isn't it? It's a little bit unusual, but there is a bar that the opposing party must get over, and that bar you stated in Pisano v. Starch, you being this court. And you have to show that to sort after discovery, would create a dispute of fact, and that is not the case here. Why is it not? I want you to focus on is the book called The Best Evidence, and said the best evidence is the body in most homicides. Now, tell me why having the autopsy report, determining how many times he was shot, and determine which one based on the angle came first, why would that not be able to shed light on terms of what his condition was, supposedly, when he was shot in the last four rounds that were fired? It's a very simple answer from my perspective. Please, give it to me. Trooper Azari did not have the benefit of being able to review an autopsy. Wait a minute. I'm not talking about his... You don't understand what I'm saying. It's not that the trooper has to know what the autopsy would have said. Obviously, he doesn't. The question is becomes, there's medical evidence that can overcome or shed light on what a body like that would have been able to be able to do and exert. For example, the police said, well, I didn't know he was dying, a second from dying. But a forensic autopsy would say, based on the wounds he received in the first 11 shots, if he stood up, that was more a nervous reaction in terms of the central nervous system, like it used to be, for example, in the guillotine in France, when they cut people's heads off, their eyes open. And the head had been disbarred from the body. But they were... You see what I'm saying? But that's what experts do. And you're telling us that, well, it's not a question whether he know that. It's not that. That sheds light on whether or not, when he looked at him, like there's evidence that he was dazed. That'd be consistent when he's up. But he's like almost a walking dead person or a person trying to stand up who's just about to die. We don't know that because there's no opportunity. Why didn't you help them? I don't know. Never mind. Forget that. Go ahead. Your Honor, I would respectfully push back a little bit on that. Push back on that. Everything you just said amounts to speculation that Trooper Zari would not know. It's not speculation. It is not having an opportunity to find out what the facts may have determined through discovery. I'm not speculating what. It may have said, you know what? He could have done cartwheels based on where his wounds were. I don't know. I'm not saying I know what the answer is. I'm saying that there may be an answer. And that's what discovery normally does. And this is a case here. Because when you fire shots, 11 shots, and you have time to then have another round of four more shots. And you say that he was hit a knife. I backed up and he was trying to get up. And I shot him. I shot four more times. I think what a body might be able to do after the shots, we know what it would be instructive. It could be instructive. But you say it wouldn't have made any difference because he didn't know what an autopsy report was. And to me, that's a non-secular response to it. But you go ahead. That's your response. No, before you go ahead, I do want to follow up on this. Because I think this might, it seems important to me. So if I'm reading this right, I understand you to be saying, well, it doesn't really matter. If the autopsy report showed that he could not have stood up, it doesn't matter. Because the trooper, from his perspective, he didn't know how badly he had been wounded and what he could and couldn't do. But I guess I'm wondering, it does seem like there's some imaginable autopsy results that would perhaps call into question whether a reasonable officer could have thought he could still stand up. Like, I understand that if the autopsy report just shows, and again, I really apologize for talking about such a sad case in this very technical and cold way. But if an autopsy report sort of showed that that one wound to the shoulder would have incapacitated him, made it impossible for him to stand up, the trooper couldn't have known that. But if an autopsy report shows he was actually wounded six times and would have been bleeding profusely from many areas of his body, well, now that's something maybe a trooper would have known and could have taken into account, right? Like, aren't there some imaginable autopsy reports that would reveal things that would, in fact, have been evident to an officer at the moment? Yes, Your Honor, there certainly is. But I don't think that's the standard. I think the standard is, is there some reason to believe discovery would create a dispute of fact? And I don't think, you know, thinking about every possible alternative of what the autopsy must show reaches that standard. Because if that is the standard, then discovery, there's no such thing as a pre-discovery motion for summary judgment. Summary judgment will be denied every time before discovery because it is impossible to meet that standard. There must be some indication that there will be a dispute of fact. Well, summary judgment before discovery is supposed to be pretty unusual. And I mean, I could imagine cases where it would just be obvious that an autopsy report wouldn't bear on what happened. I guess I'm just wondering, like, what is so wrong with a rule that says, you know, when 16-year-olds are killed by the police and it turns out they didn't even have a gun, like, let's go to discovery? Your Honor, the Supreme Court has said again and again, and I know you are suggesting it is the exception, not the rule, but that qualified immunity is a defense to suit. It is burdensome to put the government and police officers through discovery. I know that rings a little hollow in a case where a young man died. I really, so as you understand the qualified immunity jurisprudence, it's not, it's all about the discovery. I thought it was all about, you don't have to go to trial, we'll take care of this in summary judgment. But you think it's all about, we can do that, we should do this on motions to dismiss. Yes, Your Honor. Well, I don't think that's what our case law says, but. Okay, but to follow up with one final point on that, I think any reasonable speculation as to discovery still puts us back in the position of what Trooper Rosari knew. He saw one injury, he saw a young man trying to get up with a knife. And so, however you view that situation, it was reasonable for Trooper Rosari to use force. And I just want to touch back on, real fast. To use deadly force. I mean, we should be clear about it. I mean, I want to give you a chance to respond to your colleague, who I think makes sort of the best case for the opposite result, which is, I mean, he's 16, Trooper Rosari says, I know he's been seriously wounded. I guess what we can take as undisputed is he is struggling to stand up. He hasn't made it to his feet yet. And the officer who has a gun is 15 to 25 feet away. Is it not somewhat premature to use deadly force at that point? You couldn't wait another, a reasonable officer couldn't be expected to wait another second or two and see what happens? So, Your Honor, after he fires the first set of shots, he is approaching Mr. Hamm to provide medical care. He believes the situation is over. And he's just a few feet away when Mr. Hamm pulls out the knife. And Trooper Rosari then starts to back up and orders Mr. Hamm to drop the knife and lie on the ground. Mr. Hamm did not comply with those orders. He then said, I want to die. A reasonable police officer could think that someone who says, I want to die, will take measures to force the officer to use deadly force, which the only way to do that is to put the officer in jeopardy of serious injury or death. So, we know he's not incapacitated. We know from the neighbor, Michelle Miles, who says the boy was trying to stand up. And Michelle Miles tells us there was a shiny object in Mr. Hamm's hand. And finally, Michelle Miles, if you listen to the audio around the 345 mark, says they were extremely close when the shots were fired. So under those circumstances, it was reasonable for Trooper Rosari to use force. We certainly can speculate what would have happened if he had backed up and waited a few more seconds. But the law says we have to solely look at what he chose to do and whether it was reasonable and not look at those alternatives. So for me, so hypothetical, of course. Let's say if it was a five-year-old kid who he thought had a gun and then he shot, he shot him. And then the little kid gets up with a knife this time. Then you would say then the police officer could shoot the kid, five-year-old kid. It would depend on the circumstances. If he was trying to stand up and said, I want to die, which is hard to imagine from a five-year-old, it's theoretically possible. Theoretically possible, I'm just saying that's the same facts other than the age of the child, the age of the person. You would say that police officer just back up and could shoot him. I think the age is an important factor. Why? A 16-year-old. You mean to tell me a five-year-old couldn't fatally stab someone? Certainly could. Well, that's the same threat. Okay. I essentially agree. The difference is what? Police officer would just back up, back up and try to wait for somebody to come and subdue the kid and not shoot him again, probably, wouldn't he? Wouldn't he? That is certainly a possibility. And why not a 16-year-old? We can sit here and speculate about what would have happened if he did that, but we are not required to do that. He had a young man who already saw that Trooper Azari was willing to fire his weapon. He was not dropping his knife. That is crucial. And said, I want to die. Trooper Azari might not believe, and I think it's reasonable, that he has the seconds to wait. He is alone at this point. He has no reason to believe Mr. Ham is incapacitated. And I would like to just briefly touch on the incapacitation argument, because Mr. Longmore, my colleague, relies on several cases that I agree with Judge Harris do not apply to this case. Three, really, I just want to address very quickly. The first is Brockington v. Boykins. There is a use of force where a police officer shoots a suspect. The suspect falls down the steps and lands on a cement landing and is laying there, not moving, unarmed and can't get up. And then the officer fired additional shots. This court correctly held he was incapacitated for the latter shots, and it was not a reasonable use of force. Then, in the Harris v. Pittman case, we have a suspect wrestling with an officer trying to get his gun. And this court correctly determined that justifies deadly force, because officers can be shot with their own gun. However, the officer then shoots the suspect who falls down and under plaintiff's versions of the facts, fires two more shots when he is no longer a threat to get the officer's gun and is unarmed and not moving. This court held if those facts proved to be true, the force was unreasonable. And finally, on the primary case plaintiffs rely on, the state of Jones v. City of Martinsburg, we have five police officers arresting a suspect. They tase him, put him in a chokehold, and at some point they feel something sharp in the suspect's pocket. So, they scream, knife, knife, all five of them back up, stand in a semicircle, and shoot the suspect. Clearly, that was unreasonable. But this court made it clear that the knife was not in his hand. It was tucked into his sleeve and it was inaccessible. So, none of those cases resemble what happened in this case. We have a young man who did produce a knife. He is not complying. He is attempting to stand up. We know that from Mr. Longworth's evidence. And we know he's dazed. He was dazed. But the daze could actually make him more dangerous, theoretically, Your Honor. He could be more willing to do, charge the officer with the knife. This case much closely, more closely resembles the Sigmund case. So, the daze may make him more dangerous? Theoretically. But, yeah, maybe if he hadn't been shot before. I mean, I would think it would be the daze can, the daze, the implication of being dazed would be consistent with being shot and the impact on your body. I mean, it seemed to me that's more plausible. Well, I think it could go either way. But I think, again, we're straying from what Trooper Azari knew when he pulled the trigger. You don't know how many times he was shot? Well, I believe... Is that in the record? Did the district court know? You're fumbling around. I mean, do we even know that? We do not know that. He fired a number of shots on the first occasion and then less shots on the second occasion. There's one other real fast point. I'm running out of time. The district court found that there was no constitutional violation here. It did not address qualified immunity or at least the second prong. But this court has a right to affirm for any reason on the record. As this court is well aware, under Pearson v. Callahan, there's two prongs. The first prong is, was there a constitutional violation? We have essentially discussed that prong here and the district court ruled that there was not. But I think it's important to take a look at the second prong, which is whether there's clearly established law that would tell Trooper Azari his actions were unconstitutional. And on this point, the Supreme Court has made it clear it has to be very specific law. And as I've just said, I think the fact that plaintiffs have pointed to these three cases, Brockington, Pittman, and Jones, really establishes that there's not a case on point. Sigmund is much closer and the force was upheld in that case. We have several similar cases from the Supreme Court, most notably City of San Francisco v. Sheehan where police officers shot a knife, shot a knife-wielding suspect. Kissela, slightly different facts. It was a knife-wielding suspect, but the officers weren't the ones in danger. It was citizens who were close by. But in all these cases — This is not a knife-wielding case, right? Kissela, it's a knife-wielding case. This case is not knife-wielding. Oh, I believe it is, Your Honor. You do? What's the evidence that he was wielding the knife? I thought it was that he had the knife in his hand. Well, maybe — You know what wielding is, don't you? Well, I believe wielding is just holding it up. But I certainly don't want to — Is there evidence that he was holding it up as he got up on his knees? No evidence of that. Well, he's holding a knife. Okay, I will change my word. I appreciate that. He was holding a knife. And that's what they were doing in Sigmund and Sheehan and Kissela. They were holding knives. And the Supreme Court — No, they were wielding knives, as you said. But you pointed that over to this. Never mind. Go ahead. So there is no specific law on point. Even if we resolve every alleged dispute of fact in the plaintiff's favor, we have a situation of a young man with a knife trying to stand up. There is no specific case law on point that would give Trooper Azari notice that he violated Mr. Ham's constitutional rights. And the same is true for Maryland immunity. There's no evidence in this case that Trooper Azari acted with malice or gross negligence. Again, I am sorry to be standing here arguing this case. I wish I wasn't. I wish we could bring Mr. Ham back. But the law requires me and us to look at this case from the point of view of Trooper Azari. And that's what I would stress before I sit down. If the Court doesn't have any questions, I will sit down now. All right. Thank you, Your Honor. Mr. Pickus, Mr. Longmore, you have no time left. Thank you, Your Honors. A couple of responses and points. I think the big question in my mind, both in the argument that we've made in listening to my esteemed colleague make his arguments, is who determines whether Peyton was incapacitated at the time of the second shots? Is it us sitting here today with very limited evidence before us that we have not been allowed to develop through discovery? Or does the jury actually have the right to decide whether Peyton was incapacitated at that point? It's clear he'd been shot. Skip the point. The point is that after discovery is the case in a position where a juror would do that. We certainly agree with Your Honor's point on that. And that's one of the ones we made in our brief is that we should be able to develop that. The one witness to the first event, I have not been able to question as the attorney for Ms. Boyle because we have not been allowed to conduct discovery because of the posture of this case. It was a motion in the alternative. The court did treat it as a summary judgment motion. We're not trying to argue that it didn't. I remember from my clerking days, the courts have the ability to do that. But in this case, it was inappropriate because everything that the opposing counsel had said about what Trooper Azari knew and what he saw is based on two statements Trooper Azari made where he was not able to be questioned or cross-examined, where it was done by the Maryland State Police investigators themselves, of which he is a trooper for, and an affidavit, I assume, prepared with his counsel in anticipation of filing his motion. That is not what our system allows to determine what the only witness to that first round says. We don't know if Trooper Azari said the things that would hurt him in his affidavit, if there are things. We should have the right to ask him that. But the question of, you know, one of the statements that the last point that was made as to qualified immunity, we certainly agree that that should come after discovery. But even if it's not, the Jones case does have the analysis in the Jones case that we cite was actually the second or third time it had come before this Court, and it was the qualified immunity analysis. And in that, that case, which came out before this incident happened, said that once you get past a constitutional violation, there are facts that separately define the next step. And it's whether Jones, although armed, had been secured by the officers immediately before he was released. And the second one was whether Jones, though armed, was incapacitated at the time he was shot. That's a factual determination that we have the right to conduct discovery on. Right. Right. Jones, though still armed, is still a question of incapacity. Right. And in this case, that's exactly what happened here. And there was statements about the officer demanding that Payton drop the knife, demanding that he lay on his chest and not stay in the kneeling position. In Jones, there is a procedural error in discovery. So there's discovery in that case of a request for admissions. And some of the admissions, which the appeals court said are now facts, admitted in the case was that Wayne Jones was carrying a knife on his person, that officers gave verbal commands to Wayne Jones to drop his knife before they fired their weapons, that Wayne Jones refused to drop his knife, and that Wayne Jones, in that case, had stabbed an officer with a knife already. And in that case, this court said, that's not enough. Summary judgment has to be denied. Right. Those facts are right on point. And to say that there was not a clearly established standard when that case came out in 2020 and Payton was shot in 2021, we think that if we had to get to the qualified immunity, our facts as we know them now could survive that. So we're asking that the court overturn the decision below, send it back down, remand it, allow us to conduct discovery in this case. We think that we have arguments with the facts we have now. We think we'll be able to develop them more thoroughly as we go forward. We just ask the court for that opportunity. I'm happy to answer any other questions that the court has. I know it took a lot of your time. Am I over? All right. Thank you, Mr. Longmore. We'll come down to Greek Council and proceed to our last case. Thank you.
judges: Roger L. Gregory, Pamela A. Harris, David A. Faber